OPINION
In this case, Defendant/Appellant, Carla Brame, appeals from a decision of the Montgomery County Juvenile Court granting Rosemary Brame, grandmother, monthly visitation rights with Dominique and Antonio Brame. As grounds for the appeal, Carla Brame raises the following assignments of error:
 I. The trial court erred in granting Appellee monthly visitation rights in this case given the facts in evidence in the case.
II. The court should not have exercised jurisdiction.
After considering the facts and applicable law, we find the assignments of error without merit, and will affirm the trial court's decision. A brief discussion of our opinion follows.
 I
As we noted, this case involves grandparent visitation. Under R.C.3109.11, grandparents and other relatives of a deceased parent may be granted visitation rights with the decedent's unmarried minor child, if a motion is filed, and if the court decides that visitation is in the child's best interests. In deciding the best interests of the child, courts are to apply the factors outlined in R.C. 3109.151(D), which include, as pertinent here:
 (1) [t]he prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity * * *;
 (2) * * * if the person who requested companionship or visitation is not a parent, the geographical location of that person's residence and the distance between that person's residence and the child's residence;
 (3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;
(4) The age of the child;
(5) The child's adjustment to home, school, and community;
* * *
(7) The health and safety of the child;
 (8) The amount of time that will be available for the child to spend with siblings;
(9) The mental and physical health of all parties;
 (10) * * * if the person who requested companionship or visitation is not a parent, the willingness of that person to reschedule missed visitation;
* * *
 (12) In relation to requested companionship or visitation by a person other than a parent, whether the person previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child * * *;
* * *
 (14) Whether either parent has established a residence or is planning to establish a residence outside this state;
(15) Any other factor in the best interest of the child.
Decisions on visitation involve the exercise of discretion. Consequently, we will reverse only for abuse of discretion. See, e.g., Johntonny v. Malliski (1990), 67 Ohio App.3d 709, 714. Abuse of discretion has long been defined in Ohio as "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219.
After hearing testimony from the grandmother, Rosemary Brame, from the mother, Carla Brame, and from Dr. Williams, a psychologist, the trial court found that the minor children had been severely traumatized by the death of their father, and that the paternal grandmother, Rosemary, had played a considerable and important role in their lives. The court then concluded that to further traumatize the children by continuing to completely restrict Rosemary's visitation was unnecessary and unjustifiable based on the evidence presented at the hearing. Accordingly, the court held that Rosemary would be entitled to monthly visitation in the State of Texas at a time and place agreed upon by Rosemary and Carla, beginning in April, 2000. Additionally, the court encouraged the parties to agree upon more liberal visitation for the grandmother in Dayton during school breaks and summer vacation. Finally, the court said that if the parties did not agree on summer visitation, further motions and memoranda would be entertained.
As we said, Carla contends the trial court erred in making this decision. In reviewing the matter, we note initially that Carla's brief does not separately discuss the two assignments of error. Moreover, the majority of argument is focused on the jurisdictional issue. However, by reading between the lines, we glean several main points that seem to be raised. First, Carla says she does not want her children subjected to Rosemary at this time because of a need to stabilize the family. As evidence, Carla points to the fact that her husband, Kevin, left the family with three months of unpaid bills at the time of his death and to the fact the children are still under psychiatric care (now in Texas). Carla additionally points to the testimony of Dr. Williams, who allegedly said that it was not in the children's interest to see their grandmother until the issues between Rosemary and Carla were resolved. According to Carla, her relationship with Rosemary soured when she learned from the children's psychologist that Rosemary's former husband had told the children that Carla killed their father. Carla was also upset because Rosemary allowed the children's pictures to be displayed in the media after their father's death.
In order to understand these points, some factual background is necessary. Rosemary's son, Kevin, was shot and killed on November 1, 1999, outside Carla Brame's house. Kevin and Carla were married at the time, but had been separated since the beginning of October, 1999. Kevin had just dropped the two children off at the house a few moments before he was murdered. The record does not indicate if the person who did the shooting has been discovered or arrested.
At the hearing, the undisputed testimony revealed that Rosemary was significantly involved in her grandchildren's lives before the shooting. Rosemary lived less than a mile away from the children, and saw them at least once a week. The children (Dominique and Antonio) spent the night quite often with her, depending on their parents' work schedules. They were also very frequent visitors on the weekends and did many things with Rosemary, such as going to movies and attending church activities. Dominique and Antonio were five and eight at the time of the hearing, and were Rosemary's only grandchildren.
Not only was Rosemary's relationship with the children warm and loving, she also enjoyed a good relationship with Carla before the shooting. Carla thought her mother-in-law was a wonderful person. In fact, Rosemary treated Carla like one of her own children. Rosemary was a divorced mother who had raised her own three children, including Kevin, without much help from their father. She and Kevin's father, Gerald, divorced when the children were young. Gerald was not as close to Kevin as he could have been, but appeared to be trying to make up for that in the four years before Kevin's death. During that time, Gerald visited from Columbus, perhaps twice a month. Gerald did not stay at Rosemary's house when he visited. However, Gerald was in Dayton for about two weeks after Kevin's death, and did stay at Rosemary's house part of the time.
On November 19, 1999, both Carla and Rosemary met with Dr. Williams, a psychologist, about problems the boys were having adjusting to their father's death. A second appointment was scheduled for a week or two later. Rosemary came to the second appointment, but Carla did not appear. After that time, Carla and the boys did continue to see Dr. Williams, although the frequency of their visits is not revealed in the record.
After Kevin's death, and especially after Thanksgiving, 1999, Rosemary's contact with her grandchildren diminished considerably. Specifically, Carla banned her children from Rosemary's house because the children told her that their grandfather had said she [Carla] was involved in their father's death. There was no evidence that Rosemary made any such allegations or was even aware of the comments of her ex-husband. At the hearing, Carla testified that she did not want her children at Rosemary's house because their grandfather was there. However, Carla also said she had no personal animosity toward Rosemary. She stressed that Rosemary had always been and still was welcome at her house. On the other hand, Carla did leave instructions at the children's school forbidding Rosemary from seeing the children at school. Carla imposed this ban because she felt that Rosemary could come to her [Carla's] house if she wanted to see the children.
Another sore point for Carla was Kevin's possible conduct before he died. Specifically, after Kevin died, Carla learned that he may have been involved with another woman. This was naturally upsetting, but it had nothing to do with Rosemary. The woman in question had children who played on a soccer team that Kevin coached and may have been an acquaintance of Kevin's sister. However, no evidence was presented to indicate that Rosemary knew about the relationship before her son's death, or had any connection to the woman.
After Kevin's death, the police department contacted Rosemary and asked her to talk at a press conference about what a fine job they were doing. The media then broadcast pictures of Kevin's sons on television. When Carla expressed concern about this, Rosemary immediately called the police and asked them not to broadcast any more pictures. Carla agreed that Rosemary had resolved this problem and that she did not again see her children's pictures on television.
Finally, Carla testified that there was some friction with Rosemary over the Dayton Police Department. While little evidence was presented on this point, a document attached to one of Carla's pleadings indicates that Carla had some type of lawsuit pending against the Dayton Police Chief and others. Concerning this issue, Carla said only that her mother-in-law understood why she retained counsel, but had not helped her with the friction. Carla indicated she needed a "cooling off" period of a couple of months at least, before she could sit down and talk to Rosemary.
The complaint for visitation was filed in Juvenile Court on January 14, 2000, and a hearing date was set for February 1, 2000. Carla was personally served with the complaint on January 21, 2000. Subsequently, on January 31, 2000, Carla entered a limited personal appearance to contest jurisdiction. Affidavits filed at that time indicated that Carla and the grandchildren had moved to Texas on January 27, 2000, due to a job transfer. From the evidence, it is clear that Carla did not move to avoid the jurisdiction of the Juvenile Court. Instead, Carla had originally requested a transfer in 1997 from her own General Motors (GM) facility to another GM plant. Without going into irrelevant detail, the transfer was eventually approved around November 10, 1999.
According to Dr. Williams, a move as distant as the one from Ohio to Texas can create adjustment problems for children. Due to the recent and violent nature of Kevin's death, Dr. Williams did not recommend the move, and thought it should be better timed. Dr. Williams wrote GM, but was not successful in significantly delaying the move. As a result, the family ended up moving on January 27, 2000.
The hearing went forward as scheduled, on February 1, 2000, and Carla flew back to testify. During the hearing, Dr. Williams indicated that the issue was not a matter of healing between the boys and their paternal grandmother. Instead, there was some other complicating element that may have created discomfort for the boys and for Carla sometimes when the boys visited Rosemary's house. Dr. Williams recommended visitation, probably after some opportunity for the boys to have "their feet under them," in terms of established routine and normalcy. Even at that, the underlying issues would need to be addressed. According to Dr. Williams, the first point of visitation would be at three months, or might be as long as six months. By the same token, Dr. Williams said that Rosemary could see the children before the three month period, if she and Carla were able to deal with the other issues. Significantly, Dr. Williams testified that if Rosemary could fly down to Texas and see the children for a day or so on a weekend visitation, that would not disrupt the process of the children "getting their feet under them."
Rosemary was willing to visit in Texas if needed and said she would bear the cost of visiting. She expressed willingness for a healing process to begin. In contrast, Carla stated that she was the children's mother and was not going to be told when she should give her children to anyone. Carla also said she was not willing to do anything to aid the healing process and would not cooperate concerning visitation until the issues were resolved.
Finally, concerning the financial instability caused by Kevin's death, the testimony revealed that Carla's aunt's paid the back mortgage payments and taxes, and Rosemary helped with car payments. Rosemary also helped with school tuition and set up a trust fund for the children's education.
Based on the above testimony, we cannot find that the trial court acted unreasonably, arbitrarily, or unconscionably by allowing Rosemary visitation once a month in Texas. Certainly, if Gerald Brame made the alleged remarks, they were misplaced and were inconsistent with concern for the welfare of his innocent grandchildren. No matter what Mr. Brame may have believed about the circumstances of his son's death, there was no excuse for communicating his suspicions to his grandchildren. By the same token, even if Mr. Brame made improper remarks, denying the children the established comfort of their loving grandmother was not the appropriate response. We have said in the past that a recurring and regrettable tragedy in our society is the "use of children as pawns in a war between divorced and embittered parents." Bell v. Bell (June 5, 1998), Clark App. No. 97-CA-105, unreported, p. 1. The same can be said of wars between parents and grandparents. As we stressed in Bell:
 Truly, such a war has no victors and the ultimate casualties are the children, who stand to suffer deeply and permanently unless their parents can learn to control their hostility and anger towards each other. * * * [C]hildren have certain rights, including "`the right to love each parent, without feeling guilt, pressure, or rejection; the right not to choose sides; the right to have a positive and constructive on-going relationship with each parent; and most important * * * the right to not participate in the painful games parents play to hurt each other or to be put in the middle of their battles.'"
Id. (citation omitted). The children in this case have suffered enough tragedy without being used by the adults who are supposed to care for and protect them.
Further, we find that the court complied with Dr. Williams' recommendations. As we mentioned earlier, the hearing was held on February 1, 2000. The court's decision was filed on April 4, 2000, and allowed visitation to begin the same month. By the time visitation could be set up, almost three months would have passed since the hearing, and considerably more time would have passed since Rosemary last saw the children. This was consistent with Dr. Williams' recommendation that visitation could begin in about three months. And, as we said, Dr. Williams did not feel visitation in Texas would prevent the children from adjusting to their new life. Again, in line with this recommendation, the trial court ordered visitation to take place in Texas. Finally, we note that Dr. Williams did say that the parties should try to resolve their differences. In this regard, however, the roadblock was not Rosemary. Instead, Carla was the one who was unwilling to cooperate.
Accordingly, we find no abuse of discretion in the trial court's decision. We would remind the parties to keep the children's welfare in mind and to set aside differences so the children receive the support of all who can love and help them.
Based on the preceding discussion, the first assignment of error is overruled.
 II
The second assignment of error attacks the trial court's retention of jurisdiction. In this regard, Carla contends that Ohio is an inconvenient forum because she and the children now reside in Texas. Jurisdiction was admittedly proper in the first place, as Carla and her children lived in Ohio at the time she was served with the complaint.
R.C. 3109.25(A) allows a court to decline jurisdiction if the forum is inconvenient for a parenting decision or if the court of another state is a more appropriate forum. In order to decide if another state should assume jurisdiction, the following non-exclusive factors may be considered:
(1) If another state is or recently was the child's home state;
 (2) If another state has a closer connection with the child and his family or with the child and one or more of the contestants;
 (3) If substantial evidence concerning the child's present or future care, protection, training, and personal relationships is more readily available in another state;
 (4) If the parties have agreed on another forum that is no less appropriate.
R.C. 3109.25(C).
In deciding that Ohio was not an inconvenient forum, the trial court observed that it was possible that no other court had jurisdiction over the matter at the time. Whether or not that was true, the statutory criteria clearly indicate that Ohio was a more appropriate forum than Texas. Although Texas was the children's new state of residence, Ohio had a much closer connection at the time with the children and their family. Further, since the hearing was held only a few days after the move, no evidence would have existed in Texas about the children's present or future care, protection, training, and personal relationships. Instead, all the substantial and relevant evidence, including psychological testimony, was readily available in Ohio. Therefore, at the time of the hearing, Ohio was the only appropriate forum, and the trial court correctly retained jurisdiction over the matter. Consequently, the second assignment of error is without merit.
In light of the foregoing discussion, the assignments of error are overruled and the judgment of the trial court is affirmed.
FAIN, J. and GRADY, J., concur.